ABRAM SPEER

*v.*

ERIE RAILROAD COMPANY.

[Decided January 27th, 1906.]

1. A strip of land through a farm was conveyed to a railroad for a right of way, by a deed in which the railroad covenanted to provide the grantor with a convenient road crossing. One of the severed portions of the farm was intersected by a road, but there was no method of egress

from the other portion, except over the railroad crossing, and through the intersected portion to the road.—*Held*, that the right to use the crossing is not limited to the use of it as a farm crossing, but that the original grantor and his grantees have a right to use it for any purpose to which the land became adapted.

2. The right to use the crossing is not restricted to the original grantor and his grantees of the whole tract, but grantees of subdivisions thereof are entitled to use it.

3. A strip of land through a farm was conveyed to a railroad for a right of way, by a deed in which the railroad covenanted to provide the grantor with a convenient road crossing and make necessary fences on both sides of the track. The railroad company erected fences with gates at the crossing composed of sliding bars.—*Held*, that the company had no absolute right to maintain these bars after they had become unnecessary and inconvenient, because the land had ceased to be used for agricultural purposes and been plotted and sold for residence lots.

4. In a suit to enjoin the maintenance by a railroad company of an embankment destroying a crossing to which complainant was entitled under a covenant in his grantor's deed to the railroad company, evidence *held* to show that complainant was damaged to the extent of $3,000.

---

*Mr. Frederick J. Faulks* and *Mr. Halsey M. Barrett,* for the complainant.

*Mr. Cortlandt Parker, Jr.,* and *Mr. R. Wayne Parker,* for the defendant.

STEVENS, V. C.

The bill in this case was filed to restrain the defendant from maintaining its embankment where the complainant had a road crossing over defendant's railway between the severed portions of his farm. This court decreed that the company should construct a tunnel or opening through the embankment substantially at grade, such opening to be not less than twelve feet in height and width. On appeal it was thought that this direction was too onerous. It was held that the complainant's right to a crossing was not destroyed by the elevation of the tracks, but it was thought that the complainant was only, under the circumstances, entitled to damages, and that if he was willing to have them assessed in this court the bill might be retained for that purpose. The submission has been made. The question thus presented is not without difficulty, for the amount of damages

will depend upon the precise nature of the complainant's right. If the crossing is to be regarded as a mere farm or agricultural crossing, and not a crossing for all purposes, I think that $500 would be an adequate compensation for its destruction. But if the crossing is to be regarded as a crossing for all the purposes for which the land is or may become adapted, then I think that his damages are considerably greater.

In the opinion on the application for injunction I held that the covenant that the predecessor of the defendant company would "provide the party of the first part with a suitable and convenient road crossing across the track of said railway" gave an unlimited right—a right of passage for all purposes. I do not find in the opinion on appeal any dissent from this view, and further reflection has only confirmed me in its soundness. Speer, the complainant's ancestor, when he conveyed to the railroad company in June, 1870, was the owner of a farm extending easterly from Cliffside avenue to Valley road, and thence across Valley road to a line about eight hundred feet distant therefrom. The railroad, running north and south, cut this farm in two. The tract which lay west of the railroad embankment contained a little more than nine acres, and was completely severed, not only from the land lying east of the embankment and west of the Valley road, but also from the dwelling-house and barn, which lay east of that highway, and could only be reached, without trespassing upon neighboring property, by making a long circuit of three-quarters to seven-eighths of a mile.

Now, Speer's right being a right to pass from the land west of the railway to the land on both sides of Valley road, and to Valley road itself and back again, can it be said that if he had built a house or barn on the severed tract, he would not have had the right of passage therefrom to Valley road? And if he had built two or three houses, would not his right have been the same? And suppose he had conveyed the entire farm to two or three or twenty persons as tenants in common, would they not have acquired the same right? Where do we find it written or implied in the covenant that when Speer ceased to use the land for agricultural purposes his right to pass over the crossing

terminated? The language of Master of Rolls Jessel, in *New-comen* v. *Coulson, 5 Ch. Div. 133,* is applicable to the situation here: "It was said that the grant conferred a right to use the way only so long as the allotment was used for agricultural purposes. I cannot find any such restriction. The right is to the owner or owners for the time being of the land. Now, land, according to English law, includes everything on or under the soil. All buildings that you may erect on it, all mines that you may sink under it. * * * I have no doubt that the word 'land' was used advisedly. This being so, it appears to me that the right is a general right of way—a right of way to all the houses that may be built on the land in question." That the right, as Speer had it, passed to his grantees has been conclusively settled in this case, for the suit has been adjudged by the court of errors and appeals to be maintainable by the present complainant, who is the heir of the original grantee.

But it is contended, further, that while Speer and his grantees of the entire farm would have the right, a grantee of a lot in the tract west of the railway would not have it, and that consequently the possibility of utilizing portions of the land for building purposes and selling it for those purposes cannot enter into the question of value or of damages. In other words, that, so far as this question is concerned, the land must be regarded as farm land only for all time to come. The cases relied upon to support this contention are *Marino* v. *Central Railroad Co., 69 N. J. Law (40 Vr.) 628,* and the *Pipe Line Co.* v. *Delaware, Lackawanna and Western Railroad Co., 62 N. J. Law (33 Vr.) 254.* In the first case, a railroad company, empowered to take by condemnation, was required by statute to maintain over or under its road suitable wagonways where the railroad intersected the land of an individual owner, "so that he may pass the same." It was held that the owner had a right of way across the railroad, appurtenant to each of his divided tracts, but that his right was not transmitted to a grantee of a portion of the lands lying only on one side of the railroad. Chancellor Magie said: "The right reserved and the duty imposed by that section [section 9 of the charter of the M. & E. R. R. Co.] is

21

only in favor of the person who owned the lands intersected by the railroad when the railroad right was acquired by condemnation, or his grantees of the whole *or a portion of said lands* still intersected by the railroad." The decision was rested upon the authority of the *Pipe Line Case.* There, one Stewart had conveyed to the Morris and Essex Railroad Company a strip of land on which to lay its tracks, with a reservation of "a suitable wagonroad or crossing  *  *  *  so as to enable said Stewart to travel and cross freely between his lands on each side of said granted premises." The Stewart title, excepting the strip conveyed to the railroad, became vested in one Meagher. Meagher conveyed to Breckenridge, not the entire farm (see page 275 of case), but two lots, each fifty by two hundred and fifty feet, one on the north side and the other on the south side of the lands conveyed to the railroad company. These lots adjoined such lands and extended on each side of them entirely across the passageway. It was conceded in that case that under the various conveyances Breckenridge had a right of crossing between these two lots thus severed, but it was held that such right did not give the right to lay oil pipes under the railway. Mr. Justice Depue said: "The laying of these pipes in the roadway in no sense conferred a benefit on the lands to which the way was appurtenant, nor were the pipes adapted to facilitate access between the two parcels of land to which the easement was appurtenant."

I have particularly mentioned these cases because it appears to me that, so far from supporting the position of defendant, they are authorities for the opposite view, at least to this extent. They concede that a grantee of a part of the land has a right of crossing if the land acquired lie on both sides of the crossing and adjoin it, and this, too, in cases where the right is a limited right and not a right of crossing for all purposes.

In the *Marino Case,* the right was held to be limited by statute in the same way that in the *Pipe Line Case* it was held to be limited by the explicit language of the deed. It was not decided in either of those cases that where the crossing given was a crossing for all purposes, the lot-owner owning on one side would not

have the benefit of it. In the case of *United Land Co.* v. *Great Eastern Railway Co., L. R. 10 Ch. App. 586,* cited with approval in the *Pipe Line Case,* it was held that he would. But I am not obliged to decide whether he would or would not, for the reason that it is quite within the power of the complainant to avoid the question altogether. I must assume that, as a reasonable man, intent upon getting the full value of his property, he would subdivide his land so as to preserve and perpetuate all his rights. The complainant has put in evidence a map or plan. It and the additional evidence make it clear that at the time the embankment was built and the crossing destroyed, the land in the neighborhood had come into the market for building purposes. New streets had been laid out around the Speer tract and new buildings had been erected. Upper Montclair had reached out to that point. The plan shows a road running east and west through the middle of the tract, touching the crossing east and west of the railway. It also shows lots plotted on both sides of it. Now, it would be easy for the complainant to give to each purchaser of such a lot a right of way along the whole course of this road, or if that did not satisfy the requirements of the *Marino* and *Pipe Line Cases,* he could divide the land over which the road is shown into as many undivided parts as there are lots, and with each lot he could give one of these parts. The grantee of any lot would then own, in fee-simple, land on both sides of the railway continuously from his lot to Valley road.

But another and somewhat singular point has been raised. The entire clause in the Speer deed reads as follows:

"The party of the second part (the railroad company) doth, for itself and its successors, agree to make and maintain the necessary fences on both sides of said tract of land, which shall be built before the grading on said tract is commenced, and shall provide the party of the first part with a suitable and convenient road crossing across the track of said railway where the party of the first part may direct."

The proof shows that the company made the fences and put in sliding rails at the crossing. The argument is that the company had a right to maintain these rails; that those who might have lawfully crossed would have been obliged to replace them

as often as they took them down, and that the lots west of the track would have derived from such a crossing, so obstructed, little if any benefit. The evidence is that if the lots fronted on a roadway thus barred they would have less value than they would if the crossing were unobstructed.

The company's right is asserted to have been an absolute right to maintain bars, however inconvenient they might have been to the lotowners. The deed itself is silent on the subject. The general rule is that gates or bars may be placed at the termini of a way, particularly an agricultural way. It is based on the great preponderance of convenience to the landowner over the slight inconvenience to the wayowner. It ceases when the preponderance of convenience is in favor of the wayowner. *Godd. Easem. 331.*

In *Jewell* v. *Clement, 69 N. H. 133; 39 Atl. Rep. 582,* Justice Wallace says: "From the creation of a way by deed in general terms, without a provision giving the owner of the land over which it passes the right to erect gates or bars, neither a grant nor a denial of that right is necessarily to be implied. But the right to erect them cannot be implied if they constitute an unreasonable obstruction to the reasonable and proper use of the way. Neither party could have intended that the reserved way was to be subject to any unreasonable obstruction. Whether the erection of the bars by the plaintiff was a proper use of his premises, compatible with the defendant's reasonable enjoyment of the easement, or was an unreasonable obstruction of the way is a question of fact." Gates or bars were deemed proper in the following, among other cases: *Boyd* v. *Bloom, 152 Ind. 152; 52 N. E. Rep. 751; Connery* v. *Brooke, 73 Pa. St. 80; Short* v. *Devine, 146 Mass. 119; 15 N. E. Rep. 148; Bakeman* v. *Talbot, 31 N. Y. 366.* The right to maintain them was denied in the following: *Smith* v. *Worn, 93 Cal. 206; 28 Pac. Rep. 944; Devore* v. *Ellis, 62 Iowa 505; 17 N. W. Rep. 740; Jewell* v. *Clement, supra; Welch* v. *Wilcox, 101 Mass. 162; Williams* v. *Clark, 140 Mass. 238; 5 N. E. Rep. 802; Dickinson* v. *Whiting, 141 Mass. 414; 6 N. E. Rep. 92.*

*Williams* v. *Clark* was the case of a railroad crossing. H. conveyed to a railroad company by a deed which provided that

the company should furnish him with two convenient crossings, to be thereafter designated. One was so designated and a crossing built. Justice Devens said: "While, in terms, it was not provided that this crossing should be unobstructed by gates or bars, yet the fact that it was to be convenient, and that the company itself constructed and for many years permitted the existence of such a one, sufficiently shows that what it intended to grant was a free right of passage. No usage or circumstances such as are shown where one grants a way or right of way over a field devoted to agricultural or other purposes, indicating that the right granted is to be subordinate to the right of the grantor or the use made by him of the premises, here exist. That a crossing obstructed by gates or bars is far less convenient to those entitled to use it is fully conceded by the defendant's argument." In this case gates or bars were not erected in the first instance. In the case at bar they were. But I do not understand that this circumstance was regarded as decisive. It was one to be taken into account. *Bakeman* v. *Talbot, supra,* was the case of a way over a farm and woodland, where it was thought that "slip-rails" or bars were not an unreasonable obstruction. Chief-Justice Denio used this language: "There is nothing inconsistent in holding that the present arrangements are suitable and sufficient under existing circumstances, and after these circumstances have changed, and the question shall arise as to what shall then be proper, to determine that a passage perpetually open or a system of gates better adapted to such increased use than the present fences and bars shall be required of the defendant. * * * The doctrine that the facilities for passage where a private right of way exists are to be regulated by the nature of the case and the circumstances of time and place is very well settled by authority."

If a way given for all purposes cease to be used for agricultural purposes and become useful for other purposes it may be adapted to those purposes. It is a well-established rule that "in doing the works that are necessary for the enjoyment of the easement, the owner of the dominant tenement may do everything that is required for the full and free exercise of his right."

*Gale Easem.* (*7th ed.*) *464.* In *Finlinson* v. *Porter, L. R. 10 Q. B. 188,* the grantee of an easement of drain was allowed to deepen it in order to adapt it to the sewer as altered by the local authority. In *Dand* v. *Kingscote, 6 Mees. & W. 174,* the proprietor of an old colliery, who had a right of way to it, granted long before the days of railways, was held entitled to make a . railway thereover for the purpose of transmitting his coals. In *Newcomen* v. *Coulson, 5 Ch. Div. 138,* Vice-Chancellor Malins held that a lane that had been used for agricultural purposes might be converted into a metaled road for the benefit of newly-erected cottages. His judgment was affirmed on appeal. In these cases the cost of the alteration was borne by the owners of the dominant tenement. I see no reason why, if sliding rails, because of the changed use, become a source of danger rather than a means of safety, the owner of the dominant tenement may not become entitled to have substituted cattle guards, such as the law prescribes in the case of country roads, but perhaps, notwithstanding the language of the deed, at his own expense. But whether he should do the work under the supervision of the railway officials, or whether they should do it at his request and at his charge, or whether the company should do it at its own cost, is a matter of no consequence here, for the cost in any event would be so small that it would not materially affect the result.

This brings me to the question of the amount of damages to be awarded. The supplemental evidence makes it clear that the land is not to be treated as farm land. Excluding the lots on Mountain avenue and Valley road—the most valuable part of the tract—the highest estimate of the interior land—about nine acres—by any of the complainant's witnesses is $1,200 per acre, and the lowest estimate of any of defendant's is $300. The depreciation caused by the destruction of the way is variously estimated by complainant's witnesses at from $300 to $700 per acre; that is, from $2,700 to $6,300. These witnesses all agree that gates or bars would materially diminish the value of the land. Of the defendant's witnesses, two, Mr. Crane and Mr. Van Duyne, give an estimate of the value of the interior land

on the basis of a crossing obstructed by gates or bars. They do not expressly estimate it on the basis of an unobstructed crossing. Of the other witnesses for defendant, Hinks thinks that the closing of the way has been of benefit to the property, while Holmes thinks it a detriment to the extent of $50 per acre. He says: "Of course, land that has no interior access is not worth as much, ordinarily, as land that has." I do not think it can be doubted that an unobstructed passageway from the lots, as they would naturally be laid out, and as shown on complainant's map, to Valley road would be likely to make them more attractive to that class of buyers who would build houses costing from $3,000 to $4,000. The neighborhood is being rapidly improved by the erection of dwellings of that description, and this particular tract appears to be suitable for inexpensive residences. Buyers without carriages of their own would regard a direct way to Valley road, a main thoroughfare with a trolley line on it, leading into the heart of Montclair, as a considerable convenience, and as such it could not fail to have its influence upon the price. Such a road would no doubt be regarded as preferable to a more roundabout way over neighboring land, if complainant were able to purchase it.

It is necessarily a matter of conjecture as to how much complainant has been injured. Resort must be had to opinion evidence of a somewhat unsatisfactory kind. But it is the best available, and it has been necessitated by defendant's action in destroying complainant's right in the face of actual notice. Under these circumstances it does not seem to me that all doubts should be resolved in defendant's favor. I think the weight of the evidence fairly warrants a finding that the right destroyed is worth $3,000.